Valerie, I think counsel was trying to say that he cannot see Judge Garns on this screen. Judge Garns, Judge Abudu and I could see you from the bench, but counsel could not see you from the screen that was facing counsel, so we've now got that rectified. Okay, I hope counsel will be consoled by the fact that it was no big loss. Okay, Mr. Christina. Good morning, Thomas, Christina, I'm with Page Scranum in Columbus, Georgia. I'm here for Keyvon Sellers, the appellant, today. Your Honors, this case is obviously a tragedy. We lost an inmate at our jail in Columbus, Georgia. Unfortunately, however, for the case, it's not a basis for civil liability against Keyvon Sellers. Keyvon Sellers was entitled and is entitled to qualified immunity, and the district court ruling denying Keyvon Sellers qualified immunity is an error, and it needs to be reversed for the reason that it was unprecedented, and unprecedented meaning Let me make sure I understand some things. Your client, Keyvon Sellers, knew that the detainee not only had committed an aggravated assault, the sort that put him in maximum security for detention, but knew that he had If there were some facts that could bear on his classification in the jail, that he could communicate that to classification officers, and that they were receptive to that sort of thing, and it could affect their classification decisions. The classification officers testified that had they known the information Mr. Sellers knew, Officer Sellers knew, but did not communicate to them, that is, the racial motivation for his crime, it would have affected their classification. They would not have placed him in a cell with a white inmate. Right? All of that is true, isn't it? Yes, that's the facts drawn the most favorable. Which we have to do. Which we have to do. My response to that, Your Honor, is he's no different than any other inmate. He is different from any other inmate. He knows a fact about them, about this inmate, that is different from lots of other inmates, and about which the classification officers testified that had they known, it would have made a difference to them. And he knew that there could be facts about an inmate, about a detainee, that if he communicates to them that classification officers are receptive to that, that there can be those kinds of facts. And he knows about this particular fact. You know, look, it's hard to avoid qualified immunity in these deliberate indifference types of cases. But, wow, this looks like the kind of record that does it. Well, Your Honor, my concern with that is how to distinguish him from the other murderers and other folks that come in who commit aggravated assault. Well, the way you distinguish it is those others who come in, Sellers doesn't know that there was a racial motivation for what they did, as he does with this inmate. And I understand that. But to draw a distinction based on the racial motivation, they're equally as dangerous as the person that comes in who committed a murder. They're not equally dangerous, though, to particular victims. Well, I'm not sure that I agree with that, Your Honor. I understand the court's point. And what I would say in response to that is I don't know how you could say somebody who I don't know that they're any more dangerous in a general sense. But they're certainly more likely to target. They've already established that they're more likely to target a victim based on race. And that's avoidable by classifying this inmate not only to maximum security, but to ensure that this person's not put in a cell with someone for whom they've already shown they have a racial motivation for the kind of violence that has put them in maximum security. Your Honor, my response to that would be I understand the court's point. And it is troubling that you have this situation happen. But if we turn to the qualified immunity analysis and you compare the ruling from Judge Land to the opinions we cited, Brooks, Marbury, Carter, Goodman, Brown, none of those cases would have told Keevan Sellers that he needed to isolate Jayvon Hatchett or lose his qualified immunity. Now, we have Rodriguez and we have Bowen, which was Judge Karn's case. But those cases are so dissimilar. And my understanding of the 14th Amendment and the qualified immunity analysis and the reason I said that I felt like Judge Land's ruling was unprecedented is because you've got to have a case squarely on point. Well, look, the law is clearly established that the jailer cannot disregard what is an obvious risk of serious injury. The standards that are governing this inquiry here are very well established. And it cannot be that just because we don't have those particular facts where the risk is obvious that the officer gets qualified immunity unless you come up with a second case that involves exactly the same facts. I couldn't find any cases that deal with somebody charged with a hate crime coming into jail who then must be isolated. What Keevan Sellers and the correctional officers and the intake officers have dealt with is how to interpret the cases that do exist. And when you look at the specificity of the risks and the immediacy of the risks in the cases that we've cited and the fact that the court found no constitutional violation and compare that with Bowen. Let's assume that the facts were a little bit changed. This was a white supremacist who was upset by the same events that were going on in terms of racial protests and felt like the thing to do was to go out and stab the first black person that he saw. He's a skinhead and that's how he chooses to act out. Do you think it would be okay to put him in the cell with a black inmate, a black detainee? I think it's a different set of facts, but I would not quarrel with the fact that once he came into the jail, if he displayed behavior in such a way as to concern the correctional officer that he should have advised the classification folks. But what makes this case different is that... The difficulty with that, counsel, is you're basically saying he gets one assault or murder. You've got to wait until he lashes out as somebody because of race and kills or injures them before we have an obligation to do anything about it. That's not really reasonable, is it? It's an unfortunate situation, but it is my understanding of the law, and I understand the general principle of deliberate indifference in the general sense. But the way these cases that I've read from this court have been you've got to get into the facts and put yourself in Kevon Seller's shoes as to what he saw. So in that vein, one of my questions is when do we start the clock in terms of what decisions should have been made? Is it the basis for Hatchett's arrest, which I don't think there's any debate was racially motivated, or is it after Hatchett is in a cell with another white inmate, Nolan, doesn't do anything for days, then has another white inmate, Nelson, come in, is in there from what I understand from the record a couple of days, and then nothing happens. But now I guess I'm just trying to understand is the decision that it sounds like my colleagues are suggesting start because of the basis of the arrest, or does it start after some kind of altercation with the first white inmate that Hatchett encounters? In my response to that, I think you have to look at the particular defendant to decide when the clock starts. In our case, we were dealing with an intake officer whose job is to process the inmate in. Now, if the inmate displays behavior while he's observing him, the clock starts right there for him as to what he needs to do. And what he observed was no threat, no present threat. No, that's not exactly right, though, is it? Because the intake officer, your client, can learn facts. He admits this, that if he knows, presents some kind of risk, he has a duty to communicate to the classification officers. He admits that, right? He can learn specific facts about a specific detainee. He says the classification officers are receptive to that, and he can have a duty to communicate those facts, right? That's true. Yes, but in this situation, that would have required him to go further and interrogate. He knows this, though. Maybe he could have taken this inmate and not asked any questions and not learned anything about him, in which case we wouldn't be here, okay? But that's not what happened. He learned these specific facts about this particular detainee and failed to communicate them to classification officers who testified that, had they been told those facts, it would have made a difference to them. They would not have placed him in a cell with a white inmate. Isn't that right? He did not communicate that because it didn't impact him in such a way that he felt he needed to. And that's a general component, which we've argued. But, again, I go to you. But a reasonable jury could find that the serious risk that was presented by the fact he knew was so obvious that he should have communicated it. Otherwise, you're not arguing, are you, that any time an officer says, well, I didn't think that, that every officer gets qualified immunity? It can be proved by circumstantial evidence, yes, sir. But my point is that, again, to distinguish him from the many other folks at that jail who are extremely dangerous, and I understand drawing a distinction. As I put in my brief, it makes sense from some perspectives that maybe this is the way we need to go. If somebody's charged with a hate crime, they have to be isolated. And my time is up to finish this. But that's simply not the law. And to go the other way is to do what Judge Land did, which is to say in a general sense, if you know of a substantial… You misunderstand your problem. His liability is not because he failed to isolate this man from the rest of the prison population. His liability is narrow and focused. He didn't tell the intake officer. He doesn't have to go interviewing. He doesn't have to ask questions. Once he tells the intake officer, he's done. I appreciate that distinction, Judge, and my response to that would be that, again, there's no authority out there that would tell him that he would need to do that under this specific set of facts. Okay. I do have just one question, though, and this goes to mind of timing. So let's say that Officer Sellers made a mistake. He should have said something at the very beginning, but he didn't. And then Hatchett ends up being housed with a white inmate and nothing happens. And then Sellers remembers what he was told before, but now the facts show that Hatchett has been living with a white inmate with no threats of violence. I believe Nolan never complained, said that they were having conversations that were pretty genial. So does Sellers still have an obligation at that point, or does the jail have an obligation at that point to segregate Hatchett from white inmates? If we hold that he had an obligation to do something in the beginning, I think certainly that he would have an obligation to do something later on. That assumes that there's another fact that I don't think is in this record, which is that he knew what happened afterward, that Sellers knew who he ended up in a cell with. He did observe him for a number of days, three days, I believe, on the floor where he was housed. I don't believe there's testimony in the record from Sellers that he knew he was in a cell with a white inmate. Right. We don't know that fact. And part of the time he's in the cell with a white inmate, he's also in the cell with another inmate, right? Yes. The transition was Hatchett was with one white inmate for a bit, then a black inmate came in, then Nelson, and then Nelson was left alone with Hatchett. Yeah, then Nelson, a different white inmate from the first inmate. We don't know. OK. OK. Let's hear from Mr. Jones. Thank you, Your Honor. May it please the Court. I don't think I can improve upon Judge Williams' analysis. I rarely can for the points raised by the Court in this argument, and I don't really intend to say anything else about the merits of the case unless y'all have specific questions for me. I would like to make a comment from a judicial administration standpoint that this case is here on an interlocutory appeal from a denial of qualified immunity. The only issue that should be raised here is whether the law was clearly established, which it clearly is. And when Judge Land initially ruled on this case at the pleading stage, he denied their motion to dismiss. And in that order, this is what he said. Defendants do not dispute that it was clearly established before September 5th, 2020, that jail officials have a duty to protect inmates from violence at the hands of other inmates, that officials can be liable if they knew of a substantial risk of inmate or inmate violence but disregarded that risk, and that they would take reasonable measures to minimize it. So all of a sudden, they're raising it now in the Eleventh Circuit, and my concern is that the collateral order doctrine is being abused, increasingly so by defendants who just want a second bite at the apple to argue solely about disputed facts, which Mr. Gristino's got some fine arguments that he needs to make to a jury, but it doesn't need to be cluttered up the docket of this court. When the law was clearly established, and when Johnson v. Jones, the Supreme Court, said if it's a question of fact or if it's a misquestion of law and fact, it's not proper for immediate review, and Chief Pryor, you made a very, very wonderful decision about a month ago in a case called English v. Fowler where you dismissed a case for lack of jurisdiction. Counsel, I'm a little confused about your premises. What factual dispute is there in this case as it comes to us? I don't think there is any factual dispute that is essentially a qualified immunity. Then the defendant has an extraordinarily well-established right to bring up any legal issues that play into the qualified immunity denial. That's the case, but I think in this case the law is clearly established, and we're basically arguing – So you think this is a frivolous appeal? I do. I don't understand why you're taking that on. Why don't you just explain to us why there's no basis for it? In my mind – I think you guys already did a good job of that, and I think Judge Land did a good job of that. I'm simply making an observation that I spend a lot of time on every single case. On interlocutory appeals from denials of qualified immunity. Yeah, but you know, Mr. Jones, I think Judge Garne's point is, look, the Supreme Court has said that if there is a denial of qualified immunity, it's immunity from suit. That's important enough that there are collateral orders that we have jurisdiction to decide, and we have no – you know, we don't really have a choice about that. There's clearly jurisdiction. There's really not a dispute of fact. It's whether those facts provide for a clearly established constitutional violation if we view the facts in the light most favorable to your client. You don't think that we should, as a matter of decreed or language, dismiss this appeal, right? You think we should affirm Judge Land? I would respond either way. But what you think we ought to do is affirm, isn't it? I think we should affirm the court's decision. Well, then you counsel, we're not here to hear observations. We're here to hear your position on the issues and to ask you questions, one of which I'll put to you, and this may not be despising by any stretch, but I'd like to know. Suppose Hatchett had killed a black inmate. Same set of facts. Exactly, except it's a black cellmate that he kills. Would there be any liability on Sellers' part in this case? It would depend upon additional facts, but certainly in this case – What additional facts? Sir? Yeah, no, take the facts that we have. Everything exactly the same, except he, without provocation, murders a black inmate. Yeah. Is that a risk that is clearly established? Sellers has got a clearly established law against him, and he has liability or not? Does he have qualified immunity? Well, in the Bowen case, Bowen v. Warden case in 2016, this court held in 2010 that irrespective of race, race wasn't an issue in that case, but if there's information that suggests that, and this is a quote, that, quote, the attacker posed a specific risk of serious harm to any potential cellmate, end quote, But the facts, counsel, the facts in Bowen were that he was a paranoid schizophrenic, they knew it in the prison system, and that he had previously assaulted, without provocation, another inmate. That's correct. We don't have those facts in this case. I'm just exploring how far you would have us go. I would submit that there's no material difference between somebody who was convicted of a murder a year ago and somebody who tried to murder somebody because of the color of their skin days earlier and then told the booking officer and an intake nurse that he wanted to kill a white person. So, counsel, you're making this case about race. I think that's clear. But I think what opposing counsel has mentioned is that the main thing is that Hatchet was arrested for murder. And so I think to Judge Kahn's question, does it matter? I mean, so you all have argued that, you know, he was killed because he was white, but would it really matter at the end of the day in terms of any relief or remedy that your clients are entitled to? Isn't it the real fact that he was murdered? So even if he had murdered a black inmate, that black inmate's family would still have some avenue of relief, correct? I think that's correct. Under the Worden case, under the Cotone case, under other cases by this circuit, which is a risk posed to or risk posed by a particular inmate, there's a duty. And the question is— I'm confused by that, Mr. Jones. I thought that your argument was that the liability here turned on the fact that there was something about the motivation for this detainee's crime. Yes. It was not communicated to the intake officers. Now, had the detainee who was a victim here, who was strangled to death, been black, okay, I think the classification officers knew what the offense was, right? They didn't know the motivation, racial motivation, but they knew the offense. They knew this was a dangerous inmate with a propensity for violence, right? Yes. And they classified him accordingly. That is, they put him in maximum security detention, right? Yes. So, I don't understand your argument that there would still be a deliberate indifference case for sellers, for the intake officer, had the victim been black. I'm not trying to make the argument. I'm trying to answer a hypothetical question about facts that we don't have before us. Okay. My mistake was I thought I was doing you all a favor by trying to give you advice about how to deal with some of these. Well, but let's get back to, I think Judge Carnes had asked, and I understand that Judge Abudu was trying to really get at the same thing. The racial motivation really matters to your case, doesn't it? It does. Okay. That's what I thought. It wouldn't matter if the attacker was a Klansman who had burned a cross in somebody's yard and had a swastika on his forehead. You know, the outcome would be the same. So, if race is what matters, what significance is it or does the facts in the case that, number one, again, Hatchet had been housed with two white inmates, or at least one white inmate, no issue, with Nelson for a few days before things escalated to the very tragic death, admittedly, that the comment, apparently, that Hatchet made before he murdered Mr. Nelson was, you put hair in my sandwich. So in that also they were talking about racial things, but it's not clear in the record what racial things that they were talking about. So doesn't that negate to some extent this argument that the motivation was racial, as opposed to it being a murderer housed with someone that he might have had a propensity to murder? I don't hope they argue that to a jury, but, I mean, that's a jury argument. Let me also point out that he was actually housed with two white inmates. He couldn't overpower two. He only overpowered one. And when the other white inmate was released, for some reason, this man, who was apparently delusional, who obviously had mental health problems, for which he received treason from jail, he woke up at 1 o'clock in the morning, many hours after dinner time, and decided that my client's husband and brother had put a hair in his sandwich and decided, for whatever reason, to kill him. And that may or may not have been racially motivated, but what we know is they shouldn't have been in a cell together. Mr. Nelson was, I believe, arrested for failing to register as a sex offender, correct? I believe that's the case. Do you know whether or not there was any segregation of him or classification based on his sex offense? I believe he was classified, and the reason they were housed together was because of the sex offense. And that's an unfortunate thing about the classification system, because this was a man who had had an affair, had a relationship with an underage woman years earlier, which was consensual by her parents, until they broke up and there was a big falling out. So that's probably a different class of sex offense than somebody who goes around raping people. I was just really trying to understand what level of classification or review Mr. Nelson received as well. The sex offense may have maximum, and we can argue about whether that's a good system or not. It's not something I was able to litigate, because one, there's no deliberate indifference involved, and two, it's discretionary, so even if we think it's a negligent system, it's not something for which there would be liability under state law. So let me make sure I've got some facts before you sit down, because you said that he was housed with, Hatchet was housed with two white men, but not initially, right? He was assigned to cell 3E6, where he had one fellow detainee, a fellow inmate. Pardon me? Ray Nolan, a white man. Eddie Nelson, another white inmate, the victim, joins the next day. And then three men are living together until August 31st, I think. Nolan transfers to a different cell, and the next day, Clifford Shepard, a black man, joins the two in cell 3E6. They're housed together until September 4th, so most of this time we've got three, but there are some periods where there's only one, and the one is Mr. Nelson. They're housed together without issue until September 4th, on which day Shepard's relocated, leaving Hatchet and Nelson alone, and it's the next day, the 5th, the morning of the 5th, that the assault occurs, right? I think that's correct. And in the post, and after he was seen by mental health after this incident, it came up that Mr. Hatchet and Mr. Nelson had, quote, talked about racial things, and a notation was made in the file that Mr. Hatchet should not be housed with members of the white list. That fact is probably just as true before the assault happened, but I think that's why we have juries. And my only point about the law being clearly established is that I don't think that's really in dispute here, and if you consider the anomalous situation that there's a co-defendant employed by a medical contractor who's guilty of the same sin, who does not have a qualified main defense, who's going to go to trial anyway, I feel like this is just the law. Before you sit down, counsel, let me ask you this, because I don't know how far the decision in this case will go We've run into all that before. He just hates people. And he, without provocation, kills a white man, and then soon thereafter a black man, and then soon thereafter a Hispanic man. And he's sent to prison. Now, would the prison have any different obligation in that case than in this case? I don't think so. Okay, so I'm trying to figure out what role race plays here. I guess, in other words, does it mean that a certain percentage of the population is at risk, but not all the population? Whatever role that plays. Or does it mean that the remedy that they should take, the precaution they should take, the measures they should take, are narrower in our case, this case, than in the hypothetical case? All you've got to do in this case, and I quote, all you've got to do is blink in the reality of prison population, but all you've got to do in this case is keep him away from white inmates. But in my example, you've got to keep him away from all the inmates. That's your position, right? No, my position is that there's an obvious risk, which is caused by the racial animus in this case. Well, there's an obvious risk. No, you can't avoid my hypothetical. There's an obvious risk from the fact that he hates all people. Let's say all people, everybody who's got a wife, he has no problem with women, but he's after the guys. And he's going to kill as many of them as he can. That doesn't play into deliberate indifference, except as to the population at risk and the remedy or requirement to take protective steps, right? Well, if that's how it's communicated to the booking officer, inmates are isolated all the time. There are people who can't be housed with anyone else. It would just depend upon what information was known at the time of booking, and the booking officer's job is to simply pass that on to the classification officer who makes those decisions based upon a degree and based upon the training that they have. And the only reason, again, I mentioned the option of dismissal. But the prior crimes of violence, though, I think the record's pretty clear here. The prior crimes of violence of the hypothetical detainee Judge Carnes is discussing would have affected classification, right? Absolutely. And all I'm saying is you don't need to do that. I'm sorry. I thought you told us earlier, and I didn't remember this in grace, that we put maximum security in this case. Yes, right. And the classification officers also testified that if they'd known this fact, it would have further affected where they placed him in a cell, right? Right. And here's the concern about it. If you're concerned about a decision that might affect other hypothetical cases, if you still rule that the law is clearly established in this case and an interlocutory appeal is not proper to determine if the law is fully established, you don't have to do that. No, look, look. I mean, look, we've got to, Mr. Jones, come on. All right. Mr. Gristino. Judge Breyer, you're correct that he spent one night with Ray Nolan and just the two of them in this case. Yeah, right. Everything else you said was accurate based on the timeline we have in the case. Right. I'll give you my best case. A ruling in this case denying qualified immunity would be the first one from the 11th Circuit that I'm aware of or the Supreme Court that bases that denial of an intake officer based on what somebody did before they got to jail, not based on what they did in jail. Let's say, I mean, look, he's right, is he not, that it's clearly established that the officers have an obligation to prevent inmate-on-inmate violence, right? Absolutely. As a general principle. Right. I mean, so let's say the facts had been that despite the horrible violence of this crime, take away the racial motivation of it, they put him in minimum security detention, right? And there was evidence that that placement made his strangulation of another inmate more likely, even more likely than what happened here. There'd be a deliberate indifference claim there, wouldn't there? In the classification sense, yes, sir, absolutely. But we have undisputed testimony from the classification officers that had they known about the racial motivation of this detainee's crime, it would have affected their placement. They would not have placed him with a white inmate, right? So that's just one extra classification fact that is undisputed, it seems to me. I agree with you to interpret it to the plaintiff's favor, sure, but my point is different. They did testify to that, didn't they? Do you have any contrary testimony from them? No, my counter to it is that they didn't see what Keevon Sellers saw. They answered a question that was asked of them, if you were told that he killed a white guy and wanted to kill a white guy, I forgot how he phrased it, it's a different question. Because he was a white guy. They didn't see what Keevon Sellers saw. So that's the way we would fight that in front of a jury. Oh, okay, yeah, but it would have affected classification. In the same way that whether it's a violent crime or a nonviolent crime affects classification. You've just admitted that if it's a violent crime, of course that affects classification. If they don't take that into account, he could give rise to a deliberate indifference claim. In this case, though, Judge, we are saying that he has to be isolated simply because of the hate crime aspect, which is horrible. But that is totally unique. And Keevon Sellers should not have to bear that burden. That's what qualified immunity is for, in the sense that if there's not a case on point, Bowen wasn't on point, he's entitled to qualified immunity. Okay. Counsel, hold on. Go ahead, Judge Carnes. I'm waiting on you. You started first, Judge, go ahead. Well, I'm just wondering if it would be different, here we're talking about a murder, very high stakes. Is it different if we were talking about just a dislike of other races, a dislike that could be had by officers as well, CEOs? I mean, to what extent are we, are you suggesting or I guess are you concerned that the other side would be suggesting how far we should go when it comes to segregating people in prisons based on race, especially when the Supreme Court has talked about moving in a direction against that? That's exactly my concern. In 2005, Johnson v. California, you can't segregate based on race. And in this situation, a blanket holding is going to have massive implications. That's about segregation of entire classifications of prisoners, right? Not prisoner-specific classifications, right? Yes. Okay. My point is that when you go down this road, it is a concern. But tell me this, though. If that's a concern, then we can't have hate crime prosecutions. I mean, if what we're dealing with is an individual-specific propensity to violence with a racial motivation and taking that into account, if that's an impermissible consideration, then we can't have hate crime laws, can we? The veracity of hate crime laws I'm not familiar with. But what I can say, I can say that certainly they would be vulnerable to attack on the same argument, wouldn't they? There is no distinction between aggravated assault based on race. Yes, it would. But we prosecute, I mean, the state and federal governments prosecute individuals because of their racial motivations or religious motivations or whatever. There are certain protected classification-type motivations, and you get heightened penalties for that all the time. And to my best point, Judge, given all that, why is there no other case? I've looked forever to find one like this. I can't find it anywhere in this country. Maybe because other classification officers are smarter about what they communicate to each other. Your Honor, there are so many cases. I appreciate that, but I disagree respectfully. Judge Martin, did you have a question for me? Yeah, Judge. Yeah, the flying sandwich statements that Hatchett made, that doesn't go to anything other than causation, does it? The comment that the classification officer made? No, the reason, I thought Hatchett gave as an explanation for why he did it, that he, the victim, had put an insect, I thought it was a fly, in his sandwich. Am I wrong about that? You are right about that, and you are correct. I didn't understand your question. I'm sorry, Judge Carnes. That goes to classification. I mean, excuse me, as to causation, as to causation. But not to any of the issues we've been discussing? We haven't discussed causation here today, but we did brief it and argue that we would- It's a hare, right? It was a hare in a sandwich, correct. Right. Okay. Thank you, Mr. Christina. We have your case. We'll move to the last one.